Good morning. My name is Anthony Russo and I represent Cindy Mansfield, who is the appellant in this case. I brought my son along, Anthony Russo Jr., who is also an attorney. I've got a severe hearing impairment and he's here to help me out in the event I have a problem. Very good. Very well. You may proceed. May it please the Court. The Commission's decision is based on the assumption that Cindy Mansfield's condition of ill-being was the continuation of a chronic back problem resulting from degenerative disc disease and from fibromyalgia and not injuries at work. Mansfield's appeal is not based on only opinions, but on very hard evidence such as the MRI, motor changes founded on the MRI, a discogram, medical records and testimony to establish that the injuries of July 23rd, 03 and September 9th, 03 caused a herniated disc at L5-S1 and exacerbated her pre-existing asymptomatic degenerative disc. Now let's look at the evidence in the case. The Commission stated that Cindy Mansfield did not give a history of the September 9th injury, which is the second injury, to doctors Penn, O'Leary, Raven, Ganju and Liu. She actually had seven different doctors treating her. These are the doctors that they claim that she did not report the incident to. The Commission also relied on the opinion of Dr. Spencer, who said that the petitioner, or Cindy Mansfield, had chronic back pain and suffered only a sprain, which resolved itself, leaving her with chronic fibromyalgia and further that there was no connection between her fibromyalgia and the subsequent surgery. Counsel, you've alluded to several doctors that expressed opinions. The Commission relied on the opinions of Dr. Spencer and Zellbe to find the claimant's condition after April 30th. It was not related to the September 2003 accident. Dr. Liu was on the other side. Was there any medical opinion evidence offered to support causation on the claimant's side? Did any doctor testify as to causation? Was there any medical opinion on the claimant's side that supported causation? Yes. There are two doctors, Dr. Mathur and also Dr. Liu. Dr. Liu indicated that there's no question that the causation was the July 23rd, 2003 incident. Dr. Mathur indicated that both of them were causing the incident. In addition to that, there was Dr. Pimms, who also indicated that, in his opinion, both incidents caused, and the one on July 23rd in particular, caused her condition of ill-being. All right. So you've got, let's assume for sake of the argument you're correct, you've got conflicting medical evidence, two doctors on the respondent's side, two doctors on the claimant's side. Why would the Commission adopting the respondent's doctor's opinion be against the manifest weight of the evidence? Why is that not permissible? Okay. If I understand your question correctly, it's why should they not choose the respondent's doctors instead of the petitioner's doctors? Well, no oversimplifying it, but yes, that's the basic question. Okay. The respondent's doctors concluded incorrectly that Cindy Mansfield had a chronic bad condition prior to the July 23rd, the first incident, and that she had it for some time. If you check all the records, there's absolutely no evidence that she complained to anybody, especially her family doctor, who was Dr. O'Leary, who treated her from 1994 until today, as a matter of fact. There's nothing in his records that indicate that she complained about chronic back pain. I'm not sure that that's accurate. The notes here show that O'Leary's treatment notes reference the 15-year history of low back pain. Are you aware of that? She, prior to 1994, he has an indication that she had chronic back pain. Prior to 1964. But if you check his records since that time, and that's why he's subpoenaed him, there is nothing in there that indicates that she had treatment. There's a couple of indications that she had fibromyalgia, but that was never diagnosed. Even Dr. Zalby, the IME doctor for the respondent, said that that was never diagnosed and he doesn't rely on that at all. But no, there's no evidence at all that she had any, not only that, but when she talked to all the doctors, all Dr. Zalby, she told them all that her back pain started on July 23rd, 03, and never had any back pain prior to that time. Except the occasional back pain that everybody suffers from. Okay? Well, they relied, they relied on the three, the commission relied on the two IME doctors. But their doctor, their IME doctors, well, let's say Dr. Zalby, first of all. Dr. Zalby relied on Dr. Spencer, and he indicates in his testimony that he also relied on Edward Health Clinic and a treater and Dr. Spencer and Dr. Pins for finding that there was prior, a prior chronic back problem. You check those records, that's absolutely untrue. The only one that indicates that is Dr. Spencer, and if you take a look at Dr. Spencer's records, the intake questionnaire filled out by Cindy Mansfield, she indicates that the first time she had any back pain at all was July 23rd, 2003. And if you check the minimal notes taken by Dr. Spencer, you'll find that it's a one-page document. There are only about 10 or 12 one-word notes on there. And the only note that he's got indicating anything at all is fibromyalgia. It says nothing about prior back pain on there. Yet, he puts in his report that she has chronic back pain. How he found out, I don't know. But that's in his report, and he is the only one that found that. And then Dr. Zelby relied on Spencer and on the records that I indicated to you, and those records do not show any prior chronic back pain. Now let's take a look at the substantial evidence that supports Mansfield's case. Cindy did not tell all of her doctors about the September 9th report to the Park District indicating that she injured herself on July 9th, I'm sorry, on September 9th, and that that injury aggravated her preexisting injury on July 23rd. So the Park District knew about it. Dr. Mathur was told about it. If you check his record, you'll find that he was going out of the room, and the child's weight pulled her over and she fell into a door. And she said that aggravated her back condition from the July 23rd injury. She indicated that to Dr. Mathur. I told you about Spencer and Dr. Zelby. So she told everybody that she thought was necessary that she know about it. And I, there's no case that I know about that requires that you tell, that the petitioner tell every doctor about the incident where she hurt herself. If there was only one doctor, it's understandable. She's got to tell them. But if there is more than one doctor as there are here, the fact that she told half of them and didn't tell the other half really is not a big deal that I can see. I don't, I don't understand why they relied upon that. Anyway, why the commission relied upon that fact that she didn't tell all the doctors. Number two, the MRI on September 16th shows a that there was a causal connection. It's not just an opinion. He's a treating doctor. He performed the surgery. He says he has no information whatsoever on the September 3rd. No. That's the one you're appealing. Pardon? You're appealing that one, aren't you? That's what you're appealing us about? Yeah, what? I don't, I don't really think it makes any difference whether, whether. Well, it makes a big difference when you were asked if you have an opinion as to the causal connection between the workplace accident and her present condition. And you tell us that Dr. Liu gave such an opinion when he gave no such opinion. Yeah. He gave an opinion that there was a causal connection with the July incident. If you read his testimony, he says, yeah, yeah, because I asked him about that. I said, does it make any difference that she didn't tell you about the September 9th incident? He says, absolutely not. But no, I know that. But the problem is he offered no opinion as to whether there was a causal connection between the September 9th 2003 incident and her current condition. No. He said he had no information relating to that incident. What he said was. I'm looking at what he said. Okay. Okay. But what, what, let me tell you what, what he testified to so that you understand my position. He testified that it didn't make any difference to him whether he knew about that incident or not, because in his opinion, all of her condition of L.B. is related to the fall that she had on July 23rd. That's correct. Yeah. So this is an appeal. This is an appeal from the commission's decision relating to the September incident, not the July incident. I understand that. But there are cases that say you don't even need a doctor to show causation. So let me get back to Justice Hudson's question. Do you have a single doctor that says there's a causal relationship between her current condition of L.B. and her September incident? Then it would be a yes or a no answer. Yes. Dr. Pins and Dr. Mathur. And what did Dr. Pins say? Dr. Pins indicated that the condition of L.B. that she was suffering from was related to both incidents. And Dr. Mathur said there's a causal relationship between her current condition of L.B. and her September incident. And Dr. Pins said the same thing. I'm looking at Mathur's and I don't see that opinion. Okay. Do you have a copy of his testimony? Yes, we have the whole record. Okay. No, I mean in front of you. I didn't mean. No, I will have it. Yeah. Trust me on that one. Yeah. So you're telling me if I look at Dr. Mathur's testimony, I'm going to find that testimony? I'm sorry. And the same thing with Pins? If you look at Mathur's and Pins' transcripts, you will see that testimony with regard to causation. Yes. Okay. But I won't find it in Dr. Lew's testimony. I'm sorry. I won't find it in Dr. Lew's testimony. No, you will not find it. That was brought up, as I indicated, and Dr. Lew said it doesn't make any difference to me. Okay. There's no question in my mind that the July 23rd incident caused her condition of L.B. And I'll, you know, when you take a look at the testimony, it is very clear that the MRI showed a herniated disc and modic changes. And the modic changes are extremely important because it's not only evidence, it's proof that there is an acute incident. It's not something that took place over a period of time. It's something that's acute. And so that's evidence alone that it could have been either the July 23rd incident or the September 9th incident. You don't need, you don't necessarily need a doctor to testify to causation if the records are clear enough so that you can draw that conclusion. And the courts do say that. And I've got a case that I can cite to you if you want me to do that. Counsel, your time is up. You'll have time on reply. Oh, okay. May it please the Court. Counsel, good morning. My name is John Fasola. I'm here on behalf of the Naperville Park District. As Your Honors know, we actually filed a cross appeal on the issue of average weekly wage. However, I did want to start by responding to the arguments with regard to the other issues decided by the Commission, those being the issues of causal connection, TTD, medical impermanency. Our position is that the Commission was presented with facts and evidence on those issues that supported its conclusion, that they appropriately considered the testimony of witnesses, including the medical witnesses, and that they appropriately drew inferences from the evidence in making their determination. And thus, it's our position that their findings and conclusions are not against the manifest weight of the evidence. Can you try and pin down the issue we've been alluding to this morning? Yeah, absolutely. Was there a causation opinion given by any of the doctors involved in the claimant's case? Certainly not. There were four doctors that testified in this case, or four medical providers, I should say. Two doctors, Dr. Spencer and Dr. Zelby, on behalf of the employer. There were two medical providers on behalf of the claimant, and that was Dr. Liu and the chiropractor, Pins. The testimony from both Dr. Spencer and from Dr. Zelby on behalf of the employer was that there was not causal connection. I think Your Honors are aware of that. They both found that she had a minor strain at best, that she had recovered from that, reached maximum medical improvement, and that any additional problems, including the need for surgery, for example, were related to an underlying degenerative condition. What the other two medical providers, the providers that testified on behalf of the claimant, said is Dr. Pins, on his part, said that he was not even aware that she had a September 2003 incident, that he was given a history when he first saw her, notably two days after the alleged September 9, 2003 accident. He was given a history that was solely related to the July 2003 accident, and he gave absolutely no opinion regarding that date of loss. The other doctor that testified on behalf of the claimant was Dr. Liu, and Dr. Liu testified that he was not given a history of an incident on September 9, 2003. And moreover, as counsel alluded to, he actually testified that the September 9, 2003 incident, if it occurred, was irrelevant to him. So there's absolutely no causal connection of opinion. And obviously the good health chain of events theory would not be availing in this case, would it? No. I mean, our position is that given the testimony in the record, and given the testimony with regard specifically to the September 9, 2003 date of loss, that the Commission was well within its rights to look at that testimony, reach the inferences that it did, and reach the conclusions that it did, as not being against the manifest weight of the evidence based on the testimony in the record. And I think, as Your Honors noted, the fact that the case on appeal here is the September 2003 case is a relevant consideration. The question that was left to the Commission was whether or not a causal connection was established specifically with that September 2003 date of loss. And given the evidence in the record and the lack of a causal connection opinion from claimant's perspective and a clear no causal opinion from the employer's perspective, it's clear that there was substantial evidence in the record to support that conclusion by the Commission. I think claimant's counsel is sort of conflating the two cases, although only one case is on review. And I think that's significant because, for example, in the September 23, 2003 date of loss, the arbitrator actually concluded that the injury in that claim was a lumbar strain. And that case was not reviewed by claimant. The only one that was reviewed by the September, by claimant's counsel was the September 2003 date of loss. And on that, there's simply not evidence to support this Court saying that the Commission decision is against the manifest weight of the evidence. I also want to speak really briefly to Mr. Russo's contention about these modic changes on the MRI. He's mentioned that in his argument. He mentioned that in his brief. He sort of makes that the linchpin of his case. He actually refers to it in his brief as the crux of his case. The interesting thing about this allegation of the modic changes is that it's not in evidence. I mean, he cites a treatise in his brief and alleges that the treatise establishes the fact that modic changes represent an acute injury. And, aha, there's our smoking gun. We have an acute injury. There's no evidence in the record in that, that that treatise that he references was not commented on by any of the medical witnesses. It was not relied upon in anyone's opinion. And it's not in evidence in any way. And, in fact, Klayman's own surgeon, Dr. Lu, who testified in the case specifically, disagreed with the contention that Klayman is trying to make here on review, that the modic changes are somehow evidence of an acute injury. What Dr. Lute said in his testimony when asked about the MRI disc findings, he testified specifically that modic changes are consistent with a degenerative process. That's in his deposition on page 18. And he goes on to say that MRI findings are not something that's, I'm sorry, that her MRI findings are not something that's acute. You can tell the MRI findings that's something that's been there a while. That's on pages 32 and 33 of his deposition. So this contention that the modic changes are evidence that there was a specific incident that occurred in this case that caused a herniated disc,  that's something that's completely unsupported and, in fact, contradicted by his own medical evidence. Now, what about the calculation of the average weekly wage? On the average weekly wage, on that issue, we contend that the commission and the circuit court erred by including earnings from a home business as part of the average weekly wage calculation. The Act itself states that wages from second employment shall be included if the employer has knowledge. And it specifically states wages. The language of the Act itself says wages. It does not say profit. It does not say income. This issue has been raised before to the appellate court, and the appellate court has previously ruled on this contention. It's in the Poletti case? Absolutely. Okay. Poletti also cites Langford and others. So how do you do this? Does Langford give him any room to operate? Our position is that it does not. I mean, the Poletti court, I guess, gave a caveat in dicta stating that there are situations that they could imagine in which there could be a consideration of income as representing wages. And they cite specifically to Larson and they cite specifically to this Langford case. But it's interesting, if you take a look at the Langford case, the distinction that Clayman tries to make is that our case is different because it deals with the sole proprietor. That's not Langford at all. If you take a look at the Langford case, what Langford actually dealt with was someone who co-owned a business performed services as part of the business in addition. He was trying to argue that his share of the net profits should be included as his average weekly wage. And what the Tennessee court did in that case is they said, no, we don't agree with that. But in your case, there are other employees in your company who do the same job as what you were doing, and therefore, we'll use their average weekly wage and make  That's how we determine a wage. Another way to distinguish it, in Langford, as I'm reading it, Clayman was not concurrently employed in another occupation, correct? That's correct as well. Here, that's a total distinction. Here she's teaching piano outside the preschool area, right? Correct. Yeah, in Langford, they were trying to determine what his average weekly wage would be in his primary employment in order for him to be able to recoup benefits. It's not a second employment case at all. And our position is that in this case, what she earns as her business profit is simply not wages as could be considered under the language of the Act. Earned for the employer. Correct. Correct. The other thing I would mention about the evidence that was presented, I mean, it's our position that as a matter of law, and Paoletti's already ruled on this, that the profit from a second income is not wages. But secondly, in this particular case, if you look at the evidence that was presented on that question, I don't know how any finder of fact, and again, Clayman bears the burden of proof on average weekly wage as well. I don't see how a finder of fact could have looked at the evidence that was presented in the record and found out what her quote, unquote, wages or profit was for the 52 weeks prior to the accident date. What the arbitrator did is he took two full calendar years, said each one will take about six months of and cut it in half and then divide it by 52. I mean, that's just completely speculative. What the circuit court then did is they said, well, for 2003, we'll just take 25 weeks because it's clear that she only worked 25 years of that year. That's absolutely false. I mean, that's completely contrary to the record in a couple instances. Clayman herself testified that she continued to see some students for piano lessons after July 2003. And in addition, in the records that were admitted into evidence along with Dr. Spencer's deposition, she filled out her own history. And in that history was asked, are you still working? And she said, not at the Park District, but I'm still seeing piano clients at home. So the contention by the circuit court is clearly erroneous because there's absolutely evidence in the record that shows that she continued to work and teach piano students at her home after July 2003. But overall, our baseline position is that this business profit, business income, is not wages under the meaning of the Act, is not wages that can be counted as second employment and shouldn't be considered by the court here. And likewise, I think the determination as to what those wages, if you could consider them, would have been is clearly against the manifest way of the evidence. Okay. Thank you, counsel. Counsel, you may reply and respond. Well, unfortunately, I don't understand everything that counsel said, and it's hard for me to read some of this. But apparently he indicated that Dr. Liu agreed that there were degenerative changes on the MRI. That's correct. There's no question about that. But the MRI also showed that there was a herniation at L5S1, and it also showed the most important thing here are the And an acute injury could have only occurred on July 23rd or September 9th. Now, do we have to have a doctor testify that there's causation between the second incident and her condition of well-being? I don't think so. In this particular case in particular. But you have your own doctor saying there is no causation. Pardon? Your own doctor says there is no causation. He says the causation is totally to the July incident. That's correct. What? It's your own doctor testifying against you. Your Honor, what he says is it doesn't make any, if you read his testimony, it doesn't make any difference to me whether she hurt herself or had an incident on July 9th. In my opinion, based on September 23rd. No, July, I'm sorry, not July 9th, September 9th. It doesn't make any difference to me if I knew about that or not, because in my opinion, the fall that she had created the incident where the motive changes show up on the MRI. And in his opinion, everything resulted from the fall and all of her condition of ill-being, including the treatment that she needed after September 9th, the surgery and so forth, were all related to the July 23rd incident. That's right. Yeah. So how do you get causation to September 23rd out of that testimony? What I'm saying is it's not important whether you show causation for September 9th or not, because he indicates that everything that she had is related to the incident on July 23rd. But my question to you is if he testified that everything relates to the fall in July, you're appealing the denial of benefits on the September incident. I don't understand that. He says if every, how can you claim benefits for the September incident when the doctor rendered an opinion with regard to everything was related to the July incident? Yeah. What he said was that I still, I'm not sure I understand your question. Let me put it real simply. Your doctor gave a causation opinion contrary to your position today. He said the total causation for a present condition was the July incident. He didn't need any information on the September incident because it was all related to the July incident. That's correct. You're in front of us telling the commission made an error by not suggesting there was causation with the September incident. I did not. How could that be? I'm sorry. If the doctor is saying, if how, if the doctor is saying it, how could you allege that the September incident was the causation for the surgery and all of the... I'm not really, I'm not really pushing that issue because I don't think it's, it's important at all. Whether, whether she had all of her condition ability related to July 23rd incident or whether the September 9th incident was partly the cause or the main cause. I don't think it made, not the main cause, but partly exacerbated her condition. She's got the condition and Dr. Lou made it very clear that everything that she suffered in his opinion was related to July 23rd incident. That was his opinion. He didn't rule out, he didn't say that the July 9th had nothing to do with it, not July, September 9th. What he said was in his opinion, based on what the MRI showed, that there was an acute incident. He felt that it was related to the July 23rd incident because there was a fall on her rump and on her coccyx that injured her back and her arm. So I don't think it's necessary at all to show that there is causation between the September 9th issue and her condition of ill-being. That's... Then what are you appealing? Pardon? Then what are you appealing? Because the commission found that there was no causation and as a result of that, for the 9-9 incident, and as a result of that they're saying that anything that occurred after she was released by Dr. Zalby, after he examined her and said that she was at maximum medical improvement, any treatment that she had after that is not connected and therefore the respondent is not responsible. Well, that's not the situation at all. If she injured herself on July 23rd and that was the sole cause, as Dr. Luce said, then everything that resembled all the treatment and the surgery is connected. As a matter of fact, if you take a look at his testimony, Dr. Luce, I asked him, I said, is there anything that, in your opinion, that the only thing that caused her condition is the fall and that that condition is responsible for the surgery that you performed on December 13th, 04? He said, absolutely. That's what he said. So the physical therapy she had after Dr. Zalby saw her and the three injections, steroid injections she had, and all the other conservative treatment, when they found that that was not working, that's when Dr. Luce examined her and said, she's got to have surgery. So his testimony is very clear. It's July 23rd, and it really doesn't make any difference whether September 9th is a cause or not. Shouldn't you have appealed the commission's decision on the July incident, claiming that you were entitled to all of these expenses as a result of the July occurrence? It occurs to me you appealed the wrong decision. Are you talking about appealing the first decision? Yeah. And I don't understand what the question is. It appeals like it appears that you appealed the wrong decision. Well, the first decision finds that there is causation for both incidents. The first decision, there was no reason to appeal the first decision. It says that the causal relationship existed between the work injury and her condition through the date of the second accident on September the 9th. It only awarded her damages or recovery through September the 9th. It was the second decision. You wanted a recovery for the September 9th incident, and your own doctor said it was all the July incident. So you should have appealed the first decision. You should have appealed the first decision and said we're entitled to all of the expenses because everything that occurred to my client in her current condition of ill-being relates to the fall on July the 23rd. Everything does, yes, I agree with that. Everything, all of the treatment that you received results from the July 23rd incident. I don't understand your question, so I can't answer it. Why should I have appealed the first decision if it said that there's causation between her condition of ill-being and the July 23rd incident? Because the decision only said it was causation between her condition of ill-being up to the September incident and awarded no damages for that which occurred after September. Well, all I can say is that that's the problem with having a separate decision for each incident because these were all tried together and the arbitrator found that there was causation for the first incident and he left it, I don't know why he left it up to the July 9th incident. I don't understand that. I don't think there was any necessity to appeal the... Counsel, your time is up. Okay, thank you. Thank you, counsel, all for your arguments in this matter. This order will be taken under advisement and a written disposition shall issue.